MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., Plaintiff,

v.

Robert S. KRAMER, Defendant.

No. 1:92CV1841.

United States District Court,
N.D. Ohio, E.D.

Sept. 11, 1992.

Alan M. Rauss, Daniel E. Anker, Kohr-
man, Jackson & Krantz, Cleveland, OH, Mar-
sha L. Levick, Christopher Coss, Christopher
Cross, Rubin & Associates, Paoli, PA, for
plaintiff.

Cynthia C. Schafer, Frank R. Osborne,
Arter & Hadden, Cleveland, OH, for defen-
dant.

## MEMORANDUM OPINION

DOWD, District Judge.

On September 8, 1992, plaintiff Merrill
Lynch, Pierce, Fenner & Smith, Inc. ("Mer-
rill Lynch") filed a verified complaint against
Robert S. Kramer ("Kramer") alleging the
following causes of action: 1) breach of con-
tract; 2) conversion of trade secrets, custom-
er lists and confidential business information;
3) breach of fiduciary duty; and 4) unfair
competition. Along with its verified com-
plaint Merrill Lynch also filed a motion for a
temporary restraining order and preliminary
injunction (Docket # 3) seeking to enjoin
Kramer, acting alone or in concert with oth-
ers, from soliciting any business from any
client of Merrill Lynch whom Kramer served
or whose name became known to Kramer
while he was in the employ of Merrill Lynch,
from accepting any business or account
transfers from any of such customers solic-
ited for the purpose of doing business with
Kramer's present employer, and from using,
disclosing, or transmitting information con-
tained in records of Merrill Lynch.

The Court conducted a hearing on the
motion for temporary restraining order on
September 9, 1992. After hearing the par-
ties' arguments, the Court denied the motion
insofar as it sought a temporary restraining
order (Docket # 3, part 1) and scheduled the
matter for a hearing on September 11, 1992,
on the merits of plaintiff's motion for prelimi-

nary injunction (Docket # 3, part 2). That hearing was conducted as scheduled and the Court now issues its ruling.

## I. FACTUAL BACKGROUND

Defendant Kramer was a financial consultant and employee of plaintiff Merrill Lynch, a company engaged in the business of providing financial services, from August 14, 1975 until his resignation on September 4, 1992. Upon the commencement of his employment with Merrill Lynch, Kramer signed a contract entitled Account Executive Trainee Agreement ("the Agreement").[1] Among the terms of the Agreement were the following provisions:

1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form, or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally, except in the ordinary course of conducting business for Merrill Lynch.

2. In the event of termination of my services with Merrill Lynch for any reason, I will not solicit, any of the clients of Merrill Lynch whom I serve or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch or any subsidiary thereof at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated, I understand that I will be liable to Merrill Lynch for any damage caused thereby.

In addition to having signed the Agreement, Kramer annually agreed in writing to abide by Merrill Lynch's Compliance Manual[2] which provides, in pertinent part:

K. Confidential Nature of Accounts. Clients' accounts shall be handled in a highly confidential manner. You should not discuss the affairs of any client with anyone else. Client transactions should not be discussed among employees who are not concerned with the matter.

No information or records concerning the affairs of Merrill Lynch and/or its clients may be released except to persons legally entitled to receive such. This includes confidential information requested during routine regulatory visits. When in doubt, consult the Law and Compliance Division through your RVP/RM.

During the course of his employment with Merrill Lynch, Kramer serviced 565 Merrill Lynch accounts, representing over $27.4 million in assets and generating over $259,000 in annualized commission revenues in 1992 alone.

On Friday, September 4, 1992, defendant resigned from Merrill Lynch, without notice, and immediately joined a competitor securities firm, Kemper Securities Group ("Kemper").[3] Kramer's move to Kemper was carefully orchestrated by Kramer and Marc R. Silbiger,[4] the manager of the downtown Cleveland Kemper office. Kramer and Silbiger met at least four times as they negotiated Kramer's hiring by Kemper and his departure from Merrill Lynch. Approximately a week before Kramer's resignation, he delivered to Silbiger copies of Kramer's customer holding pages and customer monthly statements.[5] Kemper copied the informa-

---

1. *See* Plaintiff's Exhibit 1 as admitted during the evidentiary hearing.

2. An excerpt of this Compliance Manual is attached to the complaint as Exhibit B.

3. Kemper Securities promised Kramer that he would receive 50% of the commissions earned, a figure in excess of the percentage at Merrill Lynch, a "forgivable" loan of $72,000 and a guaranteed salary of $8,000 for the first month.

4. Mark Silbiger was deposed on September 9, 1992. During his deposition it developed that he is paid a bonus for attracting the Kemper securities established brokers with other firms. *See* Deposition, pp. 25–26.

5. *See* Silbiger Deposition, p. 30.

tion provided and returned it to Kramer. Using the information concerning the customers, Kemper prepared and Kramer approved a letter for mailing to Kramer's customers with Merrill Lynch. The letter was sent to 400 to 420 of Kramer's clients.[6] Each letter contained a transfer form with the appropriate Merrill Lynch data so that the Kramer customer could easily process a transfer of his account from Merrill Lynch to Kemper. On the occasion of Kramer's deposition on Wednesday, September 9, 1992, he estimated that as many as half a dozen transfer forms had already been received from his clients at the Kemper offices.

Plaintiff filed this lawsuit on Tuesday, September 8, 1992.[7] On September 9, 1992, just prior to the hearing on the motion for temporary restraining order, the defendant filed a motion to stay proceedings pending arbitration (Docket # 8).[8] Plaintiff asserted at the hearing that an injunction pending arbitration is nonetheless in order.

Kramer contends that if he is enjoined from servicing his Merrill Lynch customers, that he will be severely disadvantaged at a time when he has many family obligations, all to his prejudice.[9] In this case, Kramer's counsel appears to be provided by Kemper.[10] In opposing injunctive relief, Kramer has provided the affidavit of Harry Fischer, a Senior Vice President and branch manager for Kemper Securities in San Luis Obispo, California. Fischer attests to the fact of a reverse raid on Kemper by Merrill Lynch in the San Luis Obispo office on March 12, 1992, when a Kemper broker copied Kemper documents and provided them to Merrill Lynch. Fischer contends that it is a common practice in the brokerage industry for a departing broker to copy all of his customer information and provide it to the new firm before the broker's resignation. Kramer has also provided the affidavit of Emil Hrastar, who contends that he has dealt with Kramer for years and, as a part of the relationship,

Kramer has directed him in options trading. Hrastar has been notified that his new Merrill Lynch broker is Frank Bodi, Hrastar indicates that he contacted Bodi to place a trade and determine that he is not informed regarding option trading. An affidavit of Frank H. Muller, Jr. has also been provided. Muller is a Senior Vice President and branch manager for Kemper Securities, Inc. in Austin, Texas. He describes a similar reverse raid by Merrill Lynch on one of his brokers on February 21, 1992, and concludes that Merrill Lynch was provided with a customer list in a fashion similar to the California incident described by Fischer.

## II. SHOULD THE COURT CONSIDER GRANTING INJUNCTIVE RELIEF IN VIEW OF THE DEFENDANT'S DEMAND FOR ARBITRATION?

The threshold issue before the Court is whether it should consider injunctive relief in light of the defendant's motion to stay proceeding pending arbitration. Arbitration agreements are favored in the law. *See, e.g., Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

■ However, the plaintiff contends that a denial of injunctive relief under the peculiar circumstances of this case renders arbitration a hollow remedy. The issue of whether to stay the proceeding pending arbitration in similar circumstances as has been considered by a number of the circuits. However, the

6. *See* Silbiger Deposition, p. 31.

7. Monday, September 7, 1992 was a Labor Day, a federal holiday, and the Clerk's Office was not open for business.

8. The Agreement provides that any controversy arising out of Kramer's employment shall be settled by arbitration at the request of either

party in accordance with the New York Stock Exchange's Constitution and Rules.

9. Kramer has five children. Three are foster children, two of whom have psychological problems that may require unusual expenses.

10. *See* Kramer Deposition, p. 39.

parties concede that the issue has not been presented to the Sixth Circuit. The plaintiff contends and the Court agrees that the great weight of circuit authority favors consideration of injunctive relief in this type of a controversy even though a motion for stay of proceedings pending arbitration has been filed. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir.1985); *Blumenthal and Fein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F.2d 1049 (2nd Cir.1990); *Roso–Lino Beverage Distrib. v. Coca–Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984); *Sauer–Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984); *RGI, Inc. v. Tucker & Associates,* 858 F.2d 227 (5th Cir.1988); *Connecticut Resources Recovery Authority v. Occidental Petroleum Corporation,* 705 F.2d 31, 35 (2nd Cir.1983); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589 (8th Cir.1984). *See, contra, Merrill Lynch, Pierce, Fenner & Smith v. Hovey,* 726 F.2d 1286 (8th Cir.1984).

The Court is of the view that it should follow the weight of the authority. The Court agrees with the reasoning set forth in *Bradley, supra,* wherein it was stated:

Merrill Lynch and Bradley both agree that the dispute between them is subject to mandatory arbitration and that Bradley is not in default in proceeding with arbitration. Thus, the principal issue on appeal is whether § 3 of the Federal Arbitration Act, 9 U.S.C. § 3 (1982), absolutely precludes a district court from granting one party a preliminary injunction to preserve the status quo pending the arbitration of the parties' dispute.

Bradley argues that the district court abused its discretion in granting Merrill Lynch a preliminary injunction.... Bradley cites two recent decisions to support his argument. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,* 726 F.2d 1286 (8th Cir.1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Scott,* No. 83–1480 (10th Cir. May 12, 1983).

In *Hovey* the Eighth Circuit held that § 3 precludes a court from granting Merrill Lynch a preliminary injunction against its former account executives pending arbitration. The court stated that "where the

Arbitration Act is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief." 726 F.2d at 1292. In *Scott* the Tenth Circuit vacated, by order and without formal written opinion, a preliminary injunction which the district court had granted pending arbitration. Nevertheless, for the reasons that follow, we decline to follow *Hovey* and *Scott* and instead hold that, under certain circumstances, a district court has the discretion to grant one party a preliminary injunction to preserve the status quo pending the arbitration of the parties' dispute.

The starting point for our inquiry, of course, is the language of § 3:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, *the court in which such suit is pending,* upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added). Section 3 does not contain a clear command abrogating the equitable power of district courts to enter preliminary injunctions to preserve the status quo pending arbitration. Instead, § 3 states only that the court shall stay the "trial of the action"; it does not mention preliminary injunctions or other pre-trial proceedings. Certainly Congress knows how to draft a statute which addresses all actions within the judicial power. Furthermore, nothing in the statute's legislative history suggests that the word "trial" should be given a meaning other than its common and ordinary usage: the ultimate resolution of the dispute on the merits. *See* Senate Rep. No. 536, 68th Cong., 1st Sess. (1924); H.R.Rep. No. 96, 68th Cong., 1st Sess. (1924).

We do not believe that Congress would have enacted a statute intended to have the sweeping effect of stripping the federal judiciary of its equitable powers in all arbitrable commercial disputes without undertaking a comprehensive discussion and evaluation of the statute's effect. Accordingly, we conclude that the language of § 3 does not preclude a district court from granting one party a preliminary injunction to preserve the status quo pending arbitration.

*Bradley, supra.* at 1051, 1052.

As a consequence, the Court holds that Merrill Lynch is not foreclosed from seeking injunctive relief even though it concedes that the substantive issues raised by the Kramer departure are a subject for arbitration as demanded by Kramer.[11]

The Court now turns its attention to the question of whether Merrill Lynch is entitled to injunctive relief.

### III. THE STANDARD FOR PRELIMINARY INJUNCTION

When determining whether to grant a preliminary injunction, a court must consider the following factors:

1) the likelihood of success on the merits of the action;

2) the irreparable harm that could result if the court did not issue the injunction;

3) the impact on the public interest; and,

4) the possibility of substantial harm to others.

*Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 262 (6th Cir.1988).

### IV. LAW AND DISCUSSION

*A. Likelihood of Success on the Merits*

Merrill Lynch asserts that it is likely to succeed on the merits because the Agreement between it and Kramer clearly prohibits the actions which Kramer has allegedly taken. Furthermore, Merrill Lynch asserts that the restrictions in the Agreement are clearly enforceable under Ohio law since they are reasonable and since Kramer himself willingly agreed to them. Merrill Lynch asserts that it does not seek to bar Kramer from earning his living as a stockbroker, even though his doing so would be with a competitor firm serving the same community. Rather, it merely seeks to prevent Kramer from earning a living by "stealing" Merrill Lynch's customers.

In *Briggs v. Butler*, 140 Ohio St. 499, 45 N.E.2d 757 (1942), the Ohio Supreme Court held that

where the contract involved is one for personal service, advertising, solicitation or patronage and the restrictive provisions thereof relate only to the same kind or similar business, in competition with the employer and do not undertake to otherwise restrict or limit the trade occupation or profession of business or activities of the employee, the contract does not unreasonably restrict upon the rights of the employee and does not thereby contravene public policy.

*Id.* at Syllabus § 3).

Even absent a specific contractual provision, Merrill Lynch's customer list is entitled to trade secret protection under Ohio law. O.R.C. § 1333.51(A)(3) defines "trade secret" to include any "listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge." There is also a presumption of secrecy as regards such lists "when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes."

O.R.C. § 1333.81 bars an employee from disclosing such confidential information; O.R.C. § 1333.51 prohibits both the disclosure of a trade secret by an employee or other person and the use of a trade secret by anyone to whom it is passed. *See Valco Cincinnati, Inc. v. N & D Machining Ser-*

---

11. Kramer developed the fact that Merrill Lynch now sets forth in its written agreements with its brokers and trainees that it is not foreclosed from seeking injunctive relief, as in this case, by virtue of the agreement to employ arbitration to resolve disputes. However, no such reference to the right to use injunctive relief is contained in Kramer's 1975 agreement with Merrill Lynch. In the Court's view, the absence of such a provision is not dispositive.

*vice, Inc.,* 24 Ohio St.3d 41, 44–45, 492 N.E.2d 814 (1986) ("Ohio has statutorily prohibited employees in the broadest terms from disseminating or disclosing confidential matters of the employer without the knowledge or consent of the latter").

■ In this case injunctive relief is sought until the arbitration procedures are completed. Where arbitration is to take place, there is concern that any preliminary rulings by the Court might be seen as influencing or attempting to influence the eventual decision of the arbitration panel. In *Arnold v. Arnold Corp.,* 920 F.2d 1269, 1280 (6th Cir. 1990), part of this Court's opinion requiring arbitration was vacated because of such a concern. In recognition of the fact that the arbitration panel will eventually decide this case and determine what remedy, if any, plaintiff is entitled to, the Court is of the view that it should examine the "likelihood of success" issue from the standpoint of whether there exists evidence for presentation to the arbitration panel that would justify a remedy for the plaintiff rather than speculate on the "likelihood of success."

In this case, it is undisputed that Kramer negotiated an agreement with Kemper whereby he would be paid a higher percentage with respect to his commissions than at Merrill Lynch and that he was promised a "forgivable" loan of $72,000 as an additional inducement to join Kemper. It is also undisputed that Kramer produced for copying by Kemper all the necessary pertinent records concerning his customer base so that Kemper could promptly notify Kramer's customers of his switch in allegiance and solicit the appropriate transfer of Kramer's business to Kemper. It is also undisputed that such conduct violated Kramer's account executive trainee agreement with Merrill Lynch.

Therefore the Court finds that there exist facts to be submitted to the arbitration panel that would justify a remedy on behalf of Merrill Lynch [12] and thus the plaintiff has satisfied the first factor in support of its motion for injunctive relief.

**12.** It is the Court's view that it would be improper for either Kramer, Merrill Lynch, or Kemper

## B. *Irreparable Harm*

Merrill Lynch argues that it has no adequate remedy at law for the harm it will suffer in the absence of injunctive relief. Merrill Lynch cites *Merrill Lynch v. Stidham,* 658 F.2d 1098 (5th Cir.1981) for the proposition that

> [t]he injury here is such that damages could not adequately compensate. Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us.

*Id.,* at 1102. *See also, Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir.1985); *Valco, supra,* 24 Ohio St.3d at 47–48, 492 N.E.2d 814 ("injunctions are, of course, the appropriate remedy to restrain the continued and future use, or threatened use of misappropriated trade secrets").

Plaintiffs' point is well taken that "[i]t is impossible to determine at this time the numbers of Merrill Lynch clients who will be pirated away by Kramer, nor is it possible to determine with any degree of certainty the commissions each of these clients will generate."

Plaintiffs argue with equal strength that irreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch.

Finally plaintiff argues convincingly that injunctive relief is required to protect it from similar conduct by other employees and to discourage competitor firms, such as Kemper, from paying such employees large sums of money to induce them to breach their contracts, to confiscate confidential client records and to divert those clients to the competitor.

The Court finds that Merrill Lynch would be irreparably harmed by Kramer's actions and that there is no adequate remedy at law.

to place before the arbitration panel this Court's opinion.

## C. The Impact on Public Interest

In this case, the overriding public interest is the honoring and enforcement of noncompete agreements set forth in employment contracts providing the restrictions in the agreements are reasonable. In this case, the restriction upon Mr. Kramer is limited to his existing customers and then only for a period of one year. There is nothing in the agreement which prohibits Mr. Kramer from continuing with his occupation as a broker in the securities industry. There is no geographical limitation. The only restriction upon Kramer is limited to his customers as developed during his employment by Merrill Lynch.

If the Court were to deny injunctive relief in this case under its peculiar circumstances, there would be no restraint upon brokers such as Mr. Kramer from moving from brokerage house to brokerage house as deemed appropriate. The securities industry is a carefully regulated industry because the opportunity for massive fraud upon the public is ever present. To deny injunctive relief in this case would, in the Court's view, jeopardize the integrity of the securities industry and to the detriment of the public interest.

Finally, the public has an interest in the performance of contracts. To deny injunctive relief in this case would cast doubt on the integrity of contractual agreements.

## D. Possibility of Substantial Harm to Others

The obvious pawns in what appears to be continuing battles between brokerage house giants such as Merrill Lynch and Kemper Securities (*see* the Fischer and Muller affidavits) are the customers of the brokers such as Kramer who has elected to move to a more profitable employer. The granting of injunctive relief will deprive Kramer's customers of his guidance and expertise for a period of time. As indicated by the affidavit of Emil Hrastar, such a deprivation will in all likelihood have a negative effect on at least some of Kramer's customers. However, that temporary harm is significantly outweighed by the other factors the Court is required to consider in determining whether to grant injunctive relief.

## V. CONCLUSION

In sum, the Court finds that it is appropriate to consider injunctive relief even though the defendant has moved for a stay pending arbitration. Moreover, the Court finds the plaintiff is entitled to injunctive relief for a period of 120 days [13] as follows:

Conditioned upon the posting of a surety bond or cash in the sum of $100,000 defendant is enjoined and restrained, directly or indirectly, and, pursuant to Rule 65 of the Federal Rules of Civil Procedure, whether acting alone or in concert with others, including any officer, agent, representative and/or employee of defendant's current employer, Kemper Securities Group, from:

1. Using, disclosing, or transmitting information contained in the records of Merrill Lynch, including, but not limited to, the names, addresses, and financial information of clients referenced in Exhibit "A" hereto; * and that original records and all copies thereof be returned to plaintiff immediately;

2. Soliciting any business from any client of Merrill Lynch whom defendant served while in the employ of Merrill Lynch and from accepting any business or account transfer forms from any of said customers whom defendant has solicited in the past for the purpose of doing business with defendant's present employer (excluding immediate family);

3. Upon the posting of the bond, this Order shall remain in full force and effect until a final decision by a panel of arbitrators of the New York Stock Exchange duly convened in accordance with the Constitution and Rules of the New York Stock Exchange or for a period of 120 days, e.g. January 11, 1993, whichever occurs first.

**IT IS SO ORDERED.**

---

13. The Court anticipates that the arbitration panel should complete its work within 120 days.

* Editor's Note: Appendix omitted for purposes of publication.