EQUAL OPEN ENROLLMENT
ASSOCIATION, et al.,
Plaintiffs,

v.

BOARD OF EDUCATION OF the AK-
RON CITY SCHOOL DISTRICT,
et al., Defendants.

No. 5:96 CV 715.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 28, 1996.

Benjamin R. Civiletti, Venable, Baetjer & Howard, Baltimore, MD, E. John Brzytwa, Martindale & Brzytwa, Cleveland, OH, for plaintiffs.

Sharon A. Jennings, John P. Ware, Columbus, OH, Paul W. Allison, Sr., Robert M. Gippin, Karen K. Grasso, Buckingham, Doolittle & Burroughs, Akron, OH, for Akron City School District Board of Education.

Sharon A. Jennings, John P. Ware, Columbus, OH, for John M. Goff.

## ORDER

SAM H. BELL, District Judge.

Presently pending before the court is the motion of Plaintiff Equal Open Enrollment Association (EOEA), for a preliminary injunction enjoining Defendant Board of Education of the Akron City School District (Akron Board) from enforcing its policy which prohibits "white" children from transferring out of the Akron Public Schools. The parties have thoroughly briefed the issues and the court has heard argument and taken evidence on the Plaintiff's request. The question is now ripe for determination.

The matter to which this order is directed is one unique in the area of constitutional law. Its uniqueness occurs only because no court—to the knowledge of counsel and this court—has considered the application of law to facts such as those before us. It is thus beneficial to the litigants, their counsel, and perhaps the affected school community as well, to discuss the case first, in the light of the circumstances which have brought us together, and second, with a discussion of the law which assists us all in determining the issues presented.

## I. Background

Two decades and more ago, the Akron Board of Education found itself the focus of a desegregation action here in federal court. At that time in the history of this nation, public perceptions of education and its meaningful availability to minorities were being challenged. The importance of the Supreme Court's rulings in the *Brown v. Board of Education* decisions, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I* ), and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II* ), and their progeny are now legendary and need not be discussed in detail here. Suffice it to say that the opinions in these cases have over time woven a protective blanket for minorities, particularly African–Americans, who seek the benefits of our local school systems.

For its part, the Akron Board reflected the wishes of the citizens of the city it served by doing what it could to prevent the stigmata of racial intolerance from attaching to its schools. When the Akron Schools became the target of two desegregation suits, the Board was confident that it would emerge from that litigation unsullied. With minor exceptions, that is what happened. *See Arnold v. Ott,* No. C65–707 (N.D.Ohio filed Oct. 18, 1968) (Connell, J.); *Bell v. Bd. of Educ. Akron Pub. Schs.,* 491 F.Supp. 916 (1980), *affirmed,* 683 F.2d 963 (6th Cir.1982). The Akron Schools have rightfully enjoyed unitary status to this day. During the period between the end of that litigation and the present, the Akron Board has worked assiduously to not only preserve the unitary status of its schools, but also to devise new and creative methods to improve the system in all areas which might have a racial impact.

In 1993, the legislature of the State of Ohio enacted what is commonly referred to as the Open Enrollment Laws. Lacking, as we do, evidence of legislative history, we would approach interpretation of certain parts of

these enactments with some trepidation, but in the main the terms of the statute are clear. That law permits students native to public school districts to transfer to adjacent public school districts if those adjacent districts have adopted a resolution allowing such transfers. O.R.C. § 3313.98. Upon the transfer of a student, the State will transfer some portion of that student's share of state funding from the native to the adjacent school district. Generally speaking, school districts cannot deny their native students the right to transfer. However, the native school district may object to the transfer of a student (and thereby prevent the transfer of state funding as well) in two situations; First, the district may object to the transfer of a native student "in order to maintain an appropriate racial balance." O.R.C. § 3313.98(F)(1)(a). Second, the transferor district "may adopt a resolution objecting to the enrollment of its native students in adjacent districts if at least ten percent of its students are included in the determination of the United States Secretary of Education made under Section 20 U.S.C. 238(a)." O.R.C. § 3313.98(F)(1)(b).[1]

For some time prior to the enactment of this open enrollment legislation, the Akron Board had been concerned about the changing ratio of white to non-white students. The Board was fully sensitive to the problems it perceived as developing from this circumstance and did not waiver in its policy against racial disparities in its school district. When Superintendent Grier was replaced by Superintendent Williams, these considerations were ongoing. It was at this point that the Board felt compelled to consider the ramifications of the open enrollment statute and, in particular, the impact of that legislation on the Board's carefully controlled balance of racial determinants. It was also at this point that the Board received a report from its consultant Dr. Winecoff, who urged the Board to commit itself to preventing what he saw as catastrophic results stemming from the open enrollment law. According to the consultant, immediate action was required to balance the law's impending effects.

The necessity of making crucial decisions fell on the new Superintendent. According to the record, he consulted with some number of people—those on the Board and others—and with counsel in whom he placed substantial trust, and then offered the Board for its consideration the policy which the board adopted, and to which the Plaintiffs here strenuously object:

EXCEPT AS SET FORTH BELOW, NO WHITE STUDENT SHALL BE PERMITTED TO ENROLL IN AN ADJACENT DISTRICT, WHETHER OR NOT THE STUDENT'S HOME SCHOOL IN AKRON WOULD THEN BE RACIALLY IMBALANCED. THESE PROVISIONS SHALL BE SUBJECT TO ONGOING REVIEW BY THE SUPERINTENDENT, TO DETERMINE WHETHER IT IS NECESSARY IN ORDER TO MAINTAIN AN APPROPRIATE RACIAL BALANCE IN THE AKRON PUBLIC SCHOOLS.

Upon receiving a request by such a student for transfer to an adjacent school district, the Deputy Superintendent shall write the student and the student's parents and the Superintendent of the adjacent district, objecting to the transfer pursuant to the Board's policy and procedures concerning the maintaining of an appropriate racial balance.

Based on this policy, the Board has objected to the transfer of many white students to adjacent school districts. Later, and with equal bluntness, the Akron Schools ordered that no non-white student would be accepted into the Akron Schools from an adjacent district. In time, Plaintiff EOEA, an association of parents suing on behalf of themselves and the interests of their children who are white students wishing to transfer out of the Akron district, challenged the Board's policy as violative of the Ohio Open Enrollment statute, and as an unconstitutional race-based classification. The Plaintiff now seeks to enjoin its continued implementation.

1. It is the Akron Board's objection on the first of these grounds which is the subject of the instant

## II. Analysis [2]

It is well established that when considering a motion for a preliminary injunction, the court must address the following factors:

(A) Whether the party seeking the order has shown a substantial likelihood of success on the merits;

(B) Whether the party seeking the order will suffer irreparable harm absent the injunction;

(C) Whether the order will cause others to suffer substantial harm; and

(D) Whether the public interest would be served by injunctive relief.

*Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1996), *petitions for cert. filed,* 64 USLW 3727 (U.S. April 17, 1996) (No. 95–1674), 64 USLW 3795 (U.S. May 17, 1996) (No. 95–1884); *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *North Avondale Neighborhood Ass'n v. Cincinnati Metro. Hous. Auth.,* 464 F.2d 486, 488 (6th Cir.1972); *Reynolds v. International Amateur Athletic Fed'n,* 841 F.Supp. 1444, 1454 (S.D.Ohio 1992); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer,* 816 F.Supp. 1242, 1246 (N.D.Ohio, E.D.1992). No single factor is dispositive; rather, the court must balance them collectively to determine whether an injunction should lie. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985).

### A. Likelihood of success on the merits.

Plaintiff EOEA argues that it will be successful in the underlying action on two theories. First, Plaintiff argues that the Akron Board policy against white transfers violates the express terms of the Ohio statute. Second, Plaintiff argues that the policy is an unconstitutional racial classification that fails to survive strict scrutiny. Because of the long-settled rule that courts should avoid adjudication of federal constitutional claims when alternative state grounds are available,[3] this court will first address Plaintiff's state law challenge.

Plaintiff contends that the Board's policy does not strictly comply with the provisions of the Ohio Open Enrollment statute.[4] Plaintiff emphasizes that the statute only allows a school district to *"object* to the enrollment of *a native student* in an adjacent district ..."* O.R.C. § 3313.98(F)(1)(a). According to the EOEA, this language indicates a singular method of prohibiting transfer, that is, through *objection on an individual basis.* By using this particular language, Plaintiff argues, the statute "indicates that a broad-sweeping prohibitionary policy, such as the one adopted by the Akron Board, is *not* a permissible method." (Docket # 5, at 22.) To emphasize its point, Plaintiff compares this language with that used in subsection (b) of that provision which allows a board to prohibit transfer via a *resolution* in a certain circumstance not here at issue. Plaintiff concludes that subsection (b) demonstrates that "the legislature knew how to authorize school districts to make blanket objections to open enrollment transfers," but chose not to do so here. (Docket # 5, at 22.)

Certainly Plaintiff is correct that the Akron Board's policy is just that—a broad-sweeping prohibitory policy, but it also con-

---

controversy.

**2.** This section will necessarily contain both findings of fact and conclusions of law.

**3.** *See Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 192, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909) ("Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons."); *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1181, 99 L.Ed.2d 368 (1988) ("[O]ur well established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."); *Wolston v.*

*Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 160 n. 2, 99 S.Ct. 2701, 2703 n. 2, 61 L.Ed.2d 450 (1979); *Alma Motor Co. v. Timken–Detroit Axle Co.,* 329 U.S. 129, 134, 67 S.Ct. 231, 232, 91 L.Ed. 128 (1946) ("If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided."); *Mihalek Corp. v. Michigan,* 814 F.2d 290, 297 (6th Cir.1987), *modified on rehearing,* 821 F.2d 327 (1987); *Nagy v. Farmers Ins. Exchange,* 758 F.2d 189, 191 (6th Cir.1985).

**4.** The relevant language of the Ohio statute and the Board policy are provided in Part I, supra.

tains language that seems to comport with the Ohio statute. Specifically, the policy provides that the Deputy Superintendent shall object to the transfer of any individual student pursuant to the Board's policy concerning the maintenance of an appropriate racial balance. While each particular objection is based upon a broad school policy of maintaining the "appropriate racial balance," the school does *object* as to each student *individually* and does so in an apparent effort to maintain that racial balance. Plaintiffs may be right that a student-by-student assessment of the racial balance is preferable, but the plain language of the statute states no such requirement. Plaintiff does not state a substantial likelihood of success on the merits of its state law claim.

■ Thus we turn to Plaintiff's strongest challenge and the one upon which the greatest efforts of the parties have been focused: the constitutionality of the Board policy. Plaintiff has brought its action pursuant to 42 U.S.C. Section 1983, claiming violations of the Fourteenth Amendment rights of its member parents and their children.

Section 1983 provides a cause of action for an aggrieved party against one who deprived that party of protected rights while acting under color of state law. It reads in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

There is no dispute here concerning whether Defendant Akron Board was acting under color of law when it enacted the offending policy. The Akron City School District is clearly a public entity and the Board has consistently stated that it enacted its policy against white transfers pursuant to Ohio Revised Code Section 3313.98(F). Rather, the question here is whether the enactment of the Board's policy subjects the Plaintiff Association's members and their children to the deprivation of their right to equal protection of the laws.

■ The policy in question prohibits "white" Akron Schools students from taking advantage of Ohio's open enrollment law. This policy is clearly a racial classification and as such, is subject to strict scrutiny. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–94, 520, 109 S.Ct. 706, 721–22, 736, 102 L.Ed.2d 854 (1989) (five Justices endorsing application of strict scrutiny to all racial classifications); *Adarand Constructors, Inc. v. Pena,* 515 U.S. ——, ——, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995); *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). To survive strict scrutiny, the Board's racial classification must be narrowly tailored to achieve a compelling state interest. *Croson,* 488 U.S. at 505–08, 109 S.Ct. at 728–30 (opinion of the court); *Adarand,* 515 U.S. at ——, 115 S.Ct. at 2117.

According to the Akron Board of Education there is a compelling interest behind its racial policy: the prevention of *de jure* segregation of the city's schools which might result from the operation of the open enrollment law. The Board argues that Ohio's open enrollment law has served as a state-created mechanism for what it terms "white flight" from the city's schools. Traditionally, this terminology is reserved for the phenomenon whereby Caucasian citizens move out of a city to the suburbs in which their race predominates. In this instance, the Defendant Board of Education uses the term to describe not the residential changes of the citizens of Akron, but rather the transfer of its Caucasian students to the Caucasian suburban schools. According to Defendant, the inevitable result of this type of state-sponsored "white flight" is a school system which is racially disproportionate to the community in which it is located. Defendants fear a segregated school system in which Akron's "white" students are educated in the suburbs and its "non-white" students are relegated to the Akron Public Schools. In order to avoid such interdistrict racial segregation, the Ak-

ron Public Schools took advantage of the "racial balance" exception provided in the Ohio Open Enrollment statute by adopting a policy of objecting to the transfer out of any white student. Avoiding racial segregation, Defendant argues, is the compelling reason behind its race-conscious prohibitory policy.

While there is no precedent to directly support Defendant's preemptive action against segregation, the Akron Board argues that the path beaten by constitutional precedent leads to the inevitable conclusion that the prevention of imminent racial segregation is a compelling state interest. The argument proceeds as follows: Intentional separation of the races in school violates the notion of equal protection of the laws. Here, the open enrollment policy creates separation of the races, and its intent to do so is inferred by its reasonably foreseeable consequences. See Docket #30, at 20 (citing Keyes v. School Dist. No. 1, Denver, Co., 413 U.S. 189, 201–02, 93 S.Ct. 2686, 2694–95, 37 L.Ed.2d 548 (1973); Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977); Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2950–51, 61 L.Ed.2d 666 (1979)). In some contexts, the failure of government officials to prevent the deprivation of civil rights is itself a violation of civil rights. See Docket #30, at 21 (citing Walker v. Norris, 917 F.2d 1449, 1455 (6th Cir.1990) (failure to train in deliberate indifference to rights of others)). Thus, because the school district reasonably foresees racial segregation resulting from the State's open enrollment policy, Defendant believes it has a duty to avoid that result in its district.

Essentially, what the Board is arguing is that the enactment of the State open enrollment statute forced the Board to implement its race-based policy in order to avoid de jure, or intentional, state segregation in the Akron system. This argument, if subjected to judicial scrutiny, would require a court to review the evidence presented to determine if racial discrimination was a motivating factor for the legislature when it enacted the open enrollment statute. Village of Arlington Heights v. Metropolitan Hous. Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Such a review is necessary because the legislation is the causative factor in creating the alleged segregated system. This determination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266, 97 S.Ct. at 563. Here, as in a great majority of cases, the Defendant attempts to prove its case circumstantially. Defendant's starting point in the instant matter is that the school choice provision has had and will have at least some limited segregative effect. See id. However, disproportionate impact is not "the sole touchstone of an invidious racial discrimination forbidden by the Constitution." Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976); see also Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1979) (lack of racial homogeneity at various Dayton schools not, by itself, evidence of intentional segregation).

Determination of discriminatory intent would also usually be determined after consideration of a host of other factually intensive factors. See, e.g., Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (comparing treatment of black and white students); Green v. County School Board of New Kent County, Va., 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968); Diaz v. San Jose Unified School Dist., 733 F.2d 660, 670 (9th Cir.1984) (en banc), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985) (discriminatory pattern of assignment of staff and faculty, overcrowding); Swann v. Charlotte–Mecklenburg Bd. of Educ., 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971) (quality of schools). In the instant case, the Defendant has offered no evidence as to the State's discriminatory intent in enacting the Open Enrollment Law other than what it alleges to be a disproportionate number of white students taking advantage of the law. In fact, it would appear that the legislature was attempting to prevent racial segregation when it created exceptions in the law for school districts desirous of maintaining an "appropriate racial balance." It is well known that dozens of school districts in Ohio, at the time of the enactment of the legislation in ques-

tion, were immersed in efforts to maintain or achieve unitary school districts. Several, including some of the largest districts in the State, are operating under court orders to integrate their schools. It can be plainly argued—and Plaintiff does argue—that the legislature created an exception in the law in order to *avoid* racial segregation or discrimination in those districts. It is thus far from clear that the state law will create a *de jure* segregated school district here. Because it was a fear of such an outcome which prompted the Akron Board to adopt its current policy, and because there is inadequate evidence to conclude that that fear was well founded, the Board's "compelling interest" appears less than compelling.[5]

Whatever else can be said here, the Board's compelling interest can only be seen as a preventative measure directed to an anticipated problem, rather than as a remedial measure to right an already recognized discriminatory practice or condition. In espousing its rather novel argument, the Board implicitly acknowledges that which Plaintiff explicitly states: absent a finding of past discrimination, no race-based regulation has been upheld. *See, e.g., Croson,* 488 U.S. at 499–501, 506, 109 S.Ct. at 724–26, 728; *Middleton v. City of Flint,* 92 F.3d 396, 401–03, 406 (6th Cir.1996); *see also Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 288, 106 S.Ct. 1842, 1854, 90 L.Ed.2d 260 (1986) (O'Connor, J. concurring) ("remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny"); *Associated General Contractors of Cal., Inc. v. City and County of San Francisco,* 813 F.2d 922, 930 (9th Cir.1987) (state and local governments may only use racial classifications to correct own past wrongdoing). In the instant case, the Defendant School Board has twice been the target of desegregation actions and, to its

credit, has successfully defended its status as a unitary district. Thus, there is no evidence of past discrimination against minorities in the Akron Public Schools for the Defendant to remedy, nor does Defendant claim to be remedying any problem. The lack of precedent supporting Plaintiff's position casts serious doubts on the legal efficacy of the Board's stated interest.

Finally, the court finds that the Board did not have a "strong basis in evidence for its conclusion" that the alleged evil of segregation is present or imminent in the instant case. *See Middleton,* 92 F.3d at 404. The Board's argument rests squarely on the presumption that intentional racial segregation of the Akron Public Schools is imminent. The Board and Superintendent obviously reached this presumption because of their great reliance on Deputy Superintendent Spratt's straight line analysis of the schools' racial composition and their consultant Dr. Winecoff's predictions based on those numbers. These assessments were somewhat simplistic. Even Superintendent Williams himself views an "appropriate racial balance" as something other than an abstract term measured only by the comparison of raw student census numbers.[6]

Over the past decade, the white student population in the Akron Public Schools declined while the non-white student population increased. At the same time, a number of white Akron school students filed applications to transfer to neighboring school districts. Mr. Winecoff assumed that these trends would continue unabated and that the school district was on the verge of "tipping" from majority white to majority non-white. In fear that Mr. Winecoff's tipping prediction would come true, the Board implemented the current race-based policy.

5. It should be noted here that the court is not unaware of the many concerns which entered into the Board's considerations. Foremost was the problem of the fluctuating student numbers and consequent personnel reconfigurations and building usages. Also important was the possible loss of funding, possible changing standards of competition and excellence within the school system, and, of course, the continuing obligation of the Board to provide more than simply an adequate education for its students. These are interests which not only the Board but every parent, every business and every association in the City shares. Of even more importance is that the system remain responsive to the needs of the students themselves.

6. See Williams' deposition, at 112 et seq., 160.

The record and evidence in this case do not support the tipping theory. First of all, the Winecoff analysis does not suggest any reasons for the exodus of white students. The court is not at all certain that these transfers have been sought on racial grounds, rather than on other more appropriate grounds which might be eliminated if properly addressed.

It is also far from clear that significant separation of races will result from the open enrollment policy. Undeniably, the evidence tends to show that the minority student population of the Akron Public Schools has grown significantly over the past forty years and today represents approximately 47% of the Akron School enrollees. The number of minority students has fluctuated occasionally but can generally be said to have steadily increased. This trend has continued since Open Enrollment took effect in 1993. While it is true that a much higher number of white students than non-whites took advantage of the opportunity to transfer to neighboring districts' public schools, that number is very small in comparison to the overall number of students in the Akron Public Schools. Only when one examines the racial composition of particular schools does any discernible impact appear, and then only at two high schools.

At one of those two high schools the white population changed from 67.3% to 59.1% in the first year of open enrollment. In the second year of open enrollment that number went down to 58.3%.[7] This high school's student composition was the most volatile after the Open Enrollment law took effect; it represents the Defendant Board's "worst case scenario." The only conclusions that the court can draw from that example is that some white students left a predominantly white Akron school in order to attend other white suburban schools. The Akron school remains majority white today. Interestingly, in the second year of Open Enrollment the number of transferees district-wide dropped dramatically, leading to the inference that most students who wished to transfer had already done so. It thus appears that the initial number of students transferring out of the Akron Schools represents a "bubble" of students, the likes of which is unlikely to be repeated. Even assuming that an injunction created a second bubble—an assumption that is not easily made—it is doubtful that the outflow of students will create the "tipping" of racial composition about which Defendant is so concerned. This conclusion is buttressed by the neighboring school districts' small excess capability to accept transferring Akron Schools students.[8] In short, the figures offered by the Board do not support their claim that an injunction would cause massive "white flight" which would forever affect the racial makeup of the Akron Public Schools. The student interest in transferring out of the Akron Schools has been too small, and the quality of education offered there is too high to allow for an inference of acute "white flight."

Moreover, even if the School District could establish that a compelling state interest exists, a premise which this court cannot accept, the Board policy as presently written is not narrowly tailored. In *Middleton*, the Sixth Circuit considered several factors when determining whether a policy was narrowly tailored: "(1) the necessity for the relief; (2) the efficacy of alternative remedies; (3) the flexibility and duration of the relief ... (4) the relationship of the numerical goals to the relevant [pool of people]; (5) the impact of

---

7.  See Defendant's exhibit U.

8.  Simple economics would preclude the neighboring suburban districts from creating more capacity: the state funds which the transferee district receives represent only a portion of the total cost of educating each student, with the rest of the cost being paid by the taxpayers of that transferee district. If those taxpayers have already paid for the building and maintenance of schools, then the cost of educating an additional student at those schools is marginal. Thus, it makes sense for those suburban schools to attract students from neighboring districts only to the extent that they are operating at complete capacity. Once the suburban school district has reached full capacity it makes little economic sense for the taxpayers supporting those districts to spend additional funds to build new schools, because the marginal cost of meeting the higher demand of transfer students would be too high and the suburban school district would be undercompensated. They would, in effect, be subsidizing the education of students outside of their school district at the cost of those students native to their district. Some would call such an action irrational; the court sees it as doubtful indeed.

the relief on the rights of third parties." *Middleton,* 92 F.3d at —— – —— (citing *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (plurality opinion)). While that case involved a challenge to an affirmative action plan, the court believes that consideration of the *Middleton* factors will help demonstrate the shortcomings of the instant school board plan.

First, this court has already concluded that the necessity for relief was slight. The School District has not presented convincing evidence that the racial make-up of the student body will change significantly or will in any way deteriorate as a result of the Ohio Open Enrollment Law. Second, while the Board is understandably concerned about losing any students, be they white or nonwhite, the method chosen to stem those losses was the most drastic available. Indeed, there were other methods of retaining students available. Defendant's expert, Dr. Winecoff, listed several means by which the Akron Schools could attract students and garner parental enthusiasm for the school district. Inexplicably, none of these workable, alternative courses were pursued. Thus, the School District's policy meets neither of the first two elements.

Third, while the duration of the Board policy is difficult to assess at present, its inflexibility raises valid concerns. Assuming that on the day that the Board passed its current policy it was maintaining "an appropriate racial balance," it is unclear why a white student would not be allowed to transfer out after another white student moved in to the school district, or after a nonwhite moved or transferred out. Surely, such an exception would not further reduce the percentage of white students. Thus, even if we assume the appropriateness of the School District's goal, it remains clear that the policy is overbroad.

Perhaps the most obvious problem with the policy enacted by the Akron Board is that it has not defined what numerical goals it has set to achieve its "appropriate racial balance." The court understands that this particular language was foisted upon the School District by the state statute, however, it was the School District which consequently applied these vague words. It is hard to

understand how one could enforce a policy, the lynchpin of which is left undefined. How is the court or anyone else to know how such an "appropriate racial balance" was determined or whether it has been achieved? The arbitrary line drawn by the Board's implementation of its current prohibitory policy has not been explained.

The court is also quite concerned with the impact of this policy on the students, both white and non-white. The policy denies white children the opportunity to go to the school of their choice but, perhaps more importantly, through its policy the school board tells those whom it is charged to educate that they are less entitled to the benefit of the law solely because of the color of their skin. At the same time, the policy sends a contradictory message that the school board values white students but places a smaller value on its nonwhite students who are free to transfer out of the school district. These effects demonstrate the insidious nature of race-based distinctions: A stigma is placed on all of those whom the policy seeks to divide.

Finally, the court is troubled by the classification of races in the Board policy. Presumably, the policy seeks to balance student ratios between African–American and Caucasian students in the Akron School District. But the policy regulates those with white skin, a trait that could encompass members of many different racial backgrounds. It is difficult to comprehend the legitimacy of a policy so loosely drawn as to allow the different shades and hues of skin to affect a student's ability to transfer schools. Written as it is, the policy is irretrievably overbroad.

In sum, the court concludes that Defendant's policy is not narrowly tailored to achieve a compelling state interest. Therefore, Plaintiff has demonstrated a substantial likelihood of success on the merits of its Section 1983 claim. The first of the preliminary injunction elements is well satisfied.

### B. *Irreparable harm to Plaintiff.*

■ At the hearing on this matter, the court took testimony from the parents of several white students who would like to take advantage of Ohio's Open Enrollment statute but who have been denied that opportunity due to their race because of the Board policy. The parents indicated that the inability of

their children to transfer will have a significant detrimental effect on such seemingly simple matters as transportation to and from school. We use the phrase "seemingly simple" because these issues tend to seem simple only to those who do not have children to transport to school; for those to whom it is a real concern the problem can be significant, indeed.

■ While the court is quite concerned with the pragmatic difficulties raised by the Board's no-white-transfer policy, it is even more concerned that the children not be denied their opportunity under state law solely because of the color of their skin. Constitutional deprivations for even a minimal period of time are irreparable and cannot be allowed to continue once they are identified. *See Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion of Brennan, J.) (deprivation of first amendment rights irreparable injury)). Because the court has found it substantially likely that Plaintiff will prove that the Akron Board policy creates a harm of constitutional dimension, the damage which that policy visits upon children wishing to transfer in or out of the Akron Public Schools is irreparable. Hence, Plaintiff has demonstrated that this second factor weighs in its favor, as well.

### C. Substantial harm to others.

An injunction in this case would allow some students to transfer out of the Akron Schools and into a neighboring school district. The consequent transfer of state funds will undoubtedly harm the Akron Schools, as will the loss of a chance to educate those children who leave. However, that result will be a function of the Ohio Open Enrollment Statute which the political bodies of the State of Ohio have determined to be best for the children. This court cannot and will not claim credit or blame for that political decision.

Defendant also alleges a doomsday response by the parents and students of Akron to an injunctive order in this matter. As the court has already explained in Part A, *supra,* that prediction is not supported by credible evidence. Yes, there was a large response to the Open Enrollment option when it was first offered, but that response does not appear to be sustainable for the reasons explained above. Moreover, it is hard to see how the "white flight" of students transferring out of the Akron Schools envisioned by Defendant would be significantly worse than the "white flight" of families moving out of the City of Akron should the Board policy be upheld.

The court appreciates the sincerity with which Defendant expresses its concern, however, it does not share the Board's conclusion. Defendant has demonstrated some harm, but not substantial harm. This third factor thus weighs only slightly in favor of Defendant.

### D. The public interest.

In the instant case, the court can perceive no better evidence of the public interest than enforcing the Constitution and the law of the State of Ohio. The court has determined that it is substantially likely that the Akron Schools' Policy runs afoul of the Constitution, and as such, it is contrary to the public interest. This factor too, weighs in favor of Plaintiff.

### III. Conclusion

As the parties agreed several times throughout the oral argument, this case is unique. It is unique because it involves a claim of discrimination against a school system that has been twice declared unitary. It is unique because the claims of discrimination are based upon an Akron Board policy which was adopted in an honest attempt to maintain that unitary status. It is unique because the goal of all parties involved in the dispute is a school system free of discrimination and segregation. What the parties dispute is the means to maintain such a system.

This court finds that it is substantially likely that the means chosen by the Akron Board to achieve this goal are unconstitutional. While the Board's motivations appear to be pure, its race conscious policy is simply not narrowly tailored to a compelling state interest. The Board policy creates a racial classification the discriminatory nature of which rivals the evils which Akron seeks to prevent.

Akron's students and parents suffer irreparable harm by reason of the School Board policy. This irreparable injury combined

with Plaintiff's substantial likelihood of success, and the public interest in the maintenance of constitutional rights outweigh the alleged harm to the Akron Public Schools. Thus, it falls to this court to enjoin the Akron Board from enforcing its race-based policy, and thereby give meaning to the Equal Protection Clause and its ideals which proclaim that to create racial preferences or regulations—

> even for the most admirable and benign of purposes—is to reinforce and preserve for future mischief the way of thinking that produced race slavery, race privilege, and race hatred. In the eyes of government, we are just one race here. It is American.

*Adarand*, 515 U.S. at ——, 115 S.Ct. at 2110, 132 L.Ed.2d at 190 (Scalia, J., concurring).

Plaintiff's motion for a preliminary injunction is GRANTED. (Docket # 5.)

IT IS SO ORDERED.