Laurie A. BREWER and Jodie Foster, Individually and as Parents and Guardians of Jessica L. Haak, a minor, Plaintiffs,

v.

THE WEST IRONDEQUOIT CENTRAL SCHOOL DISTRICT, the URBAN–Suburban Interdistrict Transfer Program, Theresa J. Woodson, Gretchen Stephan, Marlene S. Allen, in their individual and official capacities, Monroe Number One Board of Cooperative Educational Services, Defendants.

No. 98–CV–6393L.

United States District Court,
W.D. New York.

Jan. 14, 1999.

Jeffrey Wicks, Bansbah, Zoghlin, Asandrov & Wicks, P.C., Rochester, NY, for plaintiffs.

Daniel J. Moore, Harris, Beach & Wilcox, Kevin S. Cooman, Peter J. Weishaar, Craig J. Zicari, Zicari, McConville, Cooman, Morin & Welch, Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

The basic issue before the Court is whether a governmental body—a school district—can deny a child the opportunity to participate in a school-sponsored program on account of her race. The answer must be "no." As Justice Lewis Powell said in his opinion for the Supreme Court in *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 289, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978): "the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal."

In the instant case, a child sought the benefits of a transfer program which allowed students to transfer from one school district to another. The child met all of the "criteria" for admission, save one: she was white and only "minority students" were deemed eligible for the program by those who administer it. Implementation of the program in such a fashion cannot survive analysis under the Equal Protection Clause of the United States Constitution.

Plaintiffs, Laurie A. Brewer and Jodie Foster, commenced this action against the West Irondequoit School District ("WISD"), the Monroe Number One Board of Cooperative Educational Services ("BOCES"), and several school officials who implement the Urban–Suburban Interdistrict Transfer Program ("the Program"). All of plaintiffs' claims relate to defendants' decision not to allow plaintiffs' daughter, Jessica L. Haak ("Jessica"), to participate in the program because she is a nonminority student within the Rochester City School District ("RCSD"). Specifically, Jessica, who lives in Rochester, New York and attends an elementary school in RCSD, was denied the opportunity to transfer to an elementary school in an adjoining suburban district (WISD) because she is a white Caucasian. It is undisputed that as administered, the program only allows minority students to transfer from schools in RCSD to suburban schools and only nonminority students may transfer from suburban schools to schools in the City of Rochester.

Plaintiffs assert claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) and under New York State law. Plaintiffs have now moved for a preliminary injunction ordering defendants to allow Jessica to transfer from her school in the City of Rochester to an elementary school in the WISD. For the reasons that follow, the motion is granted.

## FACTUAL BACKGROUND

### I. The Urban–Suburban Interdistrict Transfer Program

The relevant facts are for the most part not in dispute. The Program had its genesis

in a 1965 agreement between the Rochester City School District and the West Irondequoit School District. Over the years, several other suburban districts have voluntarily joined the Program; currently seven school districts—Rochester, West Irondequoit, Brighton, Brockport, Penfield, Pittsford and Wheatland–Chili—participate in the Program. Apparently, the Program is the only such interdistrict transfer program in New York. Affidavit of Theresa J. Woodson, sworn to October 13, 1998, ¶ 6.

The Program has several stated objectives, which are expressed in various documents relating to the Program. For example, the Program's "Mission Statement" states that the Program is designed to enhance and enrich the participating schools and their communities by "Reducing Minority Group Isolation," "Encouraging Intercultural Learning," "Promoting Academic Excellence," and "Fostering Responsible Civic Leadership." Affidavit of Kevin S. Cooman, sworn to October 14, 1998, Ex. D. A written "overview" of the Program similarly states that it

> encompasses a commitment to:
>
> * Promote educational options and intercultural opportunities for children from multiple ethnic backgrounds as they attend school together.
>
> * Maintain dedicated efforts to foster student and adult appreciation of their cultural commonalities and diversities.
>
> * Provide experiences in multiple, non-mandated intercultural activities that will benefit students coming from varied ethnic and social backgrounds.
>
> * Develop academic and personal challenges that correlate with the skills, abilities and experiences of both urban and suburban students.
>
> * Enhance and improve the quality of intercultural learning for both urban and suburban students from different ethnic environments.

*Id.* Ex. E.

Although the Program thus has several stated goals, it has but a single method of achieving those goals: allowing minority students to transfer out of RCSD schools to suburban schools, and allowing white students to transfer from the suburbs to the RCSD.

Despite its many stated objectives, it is clear that the main purpose of the Program is to reduce what is described as "racial isolation" within the student population of the participating school districts. As defined by regulations issued by the New York State Commissioner of Education, "[r]acial isolation means that a school or school district enrollment consists of a predominant number or percentage of students of a particular racial/ethnic group." 8 N.Y.C.R.R. § 175.24(a)(2). In other words, the program is designed to reduce the percentage of minority students in predominantly minority city schools, and to increase the percentage of minority students in predominantly white suburban schools. Neither the regulations nor any literature covering the Program states what the ideal or desired percentage should be, however.

For a number of years, the Program received funding from the federal government pursuant to the Emergency School Aid Act of 1972 ("ESAA"), formerly 20 U.S.C. § 1617. In enacting ESAA, Congress stated that it wanted to further "the process of eliminating or preventing minority group isolation ...." Former 20 U.S.C. § 1601(a). That statute, however, was repealed in 1982. After ESAA was repealed, New York State began providing funding for the Program pursuant to Ed. L. § 3602(36). That statute provides that a "school district which accepts pupils from another school district in accordance with a voluntary interdistrict urban-suburban transfer program designed to reduce racial isolation which is approved by the commissioner in accordance with regulations adopted by him for such purpose shall be eligible for aid pursuant to this subdivision." The funding provided by the State enables the transferring student to matriculate as a non-resident student without being required to pay tuition, which would normally be required.

Under the regulations, school districts seeking aid based on their participation in such a program must submit a joint application for approval of the program to the Com-

missioner of Education each year. Among other things, the districts must demonstrate to the satisfaction of the Commissioner "that the program will reduce racial isolation by transferring minority pupils, nonminority pupils or both on a voluntary basis between participating urban and suburban districts." 8 N.Y.C.R.R. § 175.24(c)(1). While the districts must submit "data showing anticipated decreases in the number and percentage of minority pupils in the schools of the participating urban district and anticipated increases in the number and percentage of minority pupils in the schools of one or more participating suburban districts . . .," however, the State does not prescribe any particular method of achieving that goal, leaving it instead for the participating districts to describe in their application for funding "the evaluation methodology to be used." N.Y.C.R.R. § 175.24(b)(2)(v), (c)(1).

As the Program is currently administered, only minority pupils are allowed to transfer from city schools to suburban schools. White students may be transferred from suburban schools to the city, provided that the transfer "do[es] not negatively affect the racial balance of the receiving school . . . ." RCSD Directory 1997–98 (Cooman Aff. Ex. G) at 19. There is no statement or definition of the proper "racial balance" that should be maintained.

State regulations define "minority pupil" as "a pupil who is of Black or Hispanic origin or is a member of another racial minority group *that historically has been the subject of discrimination.*" 8 N.Y.C.R.R. § 175.24(a)(1) (emphasis added). Defendant Theresa J.Woodson, Director of the Urban–Suburban Interdistrict Transfer Program, states in an affidavit that under the Program, students of Asian or American Indian origin are also considered to be minority pupils eligible for transfer to suburban schools. Woodson Aff., ¶ 8.

The participating districts' joint application to the Commissioner of Education for the 1996–97 school year indicates that overall, the suburban districts reported a minority student population of less than ten percent, while the RCSD reported a minority student population of about eighty percent. Cooman

Aff. Ex. B. As of July 1997, the RCSD's total student population from kindergarten through twelfth grade was 37,153, which means that the number of minority students was roughly 29,700. *Id.* Ex. G. The RCSD reported that 591 minority students had been transferred during the 1996–97 school year from RCSD schools to participating suburban schools, and that 29 white students had been accepted into the RCSD from the participating suburban schools. The number of minority students accepted by the suburban districts ran from 53 in the Wheatland–Chili Central School District to 180 in the Pittsford Central School District. *Id.* Ex. B.

The Program, in effect, allows a student to transfer to another district without any financial consequence to the student. West Irondequoit has established a tuition for nonresident students who wish to attend the school, subject to availability of space.

Because this Program is funded by the State, however, the transferring student pays no tuition and is treated like a resident student in all respects. The State provides aid to the receiving school district and provides reimbursement for some costs associated with the attendance of the transferring student, who pays neither tuition nor any property taxes in that district. Affidavit of Mary Beth Lovejoy, Assistant Superintendent for Business, BOCES, sworn to on October 8, 1998, ¶ 8.

Obviously, it is of great benefit, financial and otherwise, for a student such as Jessica to attend a suburban school which she, at least, perceives as a "better school" for her, without financial obligation of any kind. The Program is very popular and it appears that the number of applicants far exceeds the space available in the six suburban districts. Plaintiffs' application in this case was rejected on two prior occasions because space was unavailable.

Under the Program, parents of students in RCSD schools may request that their children be transferred to one of the participating suburban districts, and parents of students in a participating suburban district may request a transfer to the RCSD. Woodson states in an affidavit that the usual pro-

cedure is for a Program staff member initially to fill out a brief application form while speaking to the parent over the telephone, then to send an acknowledgment letter to the parent. Although neither the application nor the acknowledgment letter contains any reference to the student's race or ethnicity, Woodson claims that the staff member informs the parent over the telephone of the racial criteria. She states that, based upon that usual practice, Brewer "would have been told of the minority pupil criteria ...," Woodson Aff. ¶ 28, though Brewer alleges that she was not given that advice. Reply Affidavit of Laurie A. Brewer (Item 10) ¶ 7.[1]

Once an application has been submitted, the Program office requests the applicant's report cards and other performance information. All the applicants' records are then sorted by grade level and sent to potential receiving schools, whose principals then determine, based on the number of spaces they have available, which students they will accept. Cooman Aff., Ex. A. Although there are certain limitations on the reasons why a particular student can be selected for transfer (e.g., the transferring district cannot select a student solely because the student is considered a disciplinary problem, nor can the receiving district accept a student solely for the purpose of improving the district's nonacademic programs, such as sports), it does not appear that there are any particular criteria upon which the receiving schools' principals must make their decisions. Glenn Wachter, the Superintendent of the WISD, states in an affidavit only that "the Principal selects students based upon their classroom records and space availability." Affidavit of Glenn Wachter, sworn to October 9, 1998, ¶ 19. Except for that, the record is silent as to the criteria used by the administrators to differentiate among the numerous students seeking transfer.

## II. Jessica Haak's Application to Participate in the Program

Jessica, who was born in November 1988, and lives in the City of Rochester is, and has been since first grade, a student at School Number 39 in the RCSD. She is currently in fourth grade. In 1996, plaintiffs applied to the Program, seeking a transfer for Jessica to a suburban school. The application form contained no space for stating the race or ethnicity of the applying student. Defendant Woodson states that it has been the practice of the Program administrators to rely on parents to "self-screen" their children, i.e. not to submit an application unless their child meets the appropriate race or ethnicity requirement. Woodson Aff. ¶ 20. Thus, the persons reviewing Jessica's application, who had never met Jessica, had no knowledge whether she was a minority pupil. Apparently, they just assumed that she was.

That year and the following year, plaintiffs were advised that no spaces were available for Jessica, but her application was kept active. In July 1998, the Program sent Brewer a letter informing her that there might be an opening for Jessica at the Iroquois Elementary School in WISD. An interview was then set up for Jessica and her mother at Iroquois. The interview was conducted by defendant Gretchen Stephan, Assistant Principal at Iroquois, and two other Iroquois staff members. Following the interview, Stephan informed plaintiffs that Jessica had been accepted for placement at Iroquois for the 1998–99 school year.[2]

On August 27, 1998, Jessica and her mother attended an orientation meeting for the families of all incoming transferee students at Irondequoit High School. At the meeting,

1. Although this matter may be in dispute, for purposes of plaintiff's motion for a preliminary injunction it is immaterial, since it is not disputed that Jessica was ultimately barred from the Program on account of her race, and plaintiffs' claims in no way depend upon whether or at what point they were informed of the racial criteria.

2. Defendants have not submitted an affidavit from Stephan. This is curious since she was the person who accepted Jessica into the Program after meeting her. We do not, therefore, know the basis for Jessica's acceptance nor do we know whether Stephan was aware that Jessica was not a minority student. Since there is no dispute that Jessica was eventually barred from participation because she is a nonminority pupil within the RCSD, however, this has no material effect on any of the issues now before me.

each family was given a packet of documents concerning the Program. Among the documents that plaintiffs received was a "Mission Statement," which listed one of its goals as "Reducing Minority Group Isolation ...." Affidavit of Laurie A. Brewer, sworn to September 18, 1998, Ex. F. Plaintiffs were also given a written overview of the Program, which stated, *inter alia,* that the Program was intended "to provide opportunities for integrated multicultural education and 'reduce racial isolation' ...." *Id.* Ex. G. None of these documents explicitly stated that nonminority students within the RCSD could not participate in the Program, however.

It was at this meeting that Woodson saw Jessica and her mother for the first time. Woodson states that based on Jessica's appearance, Woodson was concerned about whether she was in fact a minority pupil, but that she did not think she should raise the issue in that setting, with other families present. Woodson Aff. ¶ 36. The following day, however, Woodson checked Jessica's RCSD records and saw that Jessica's ethnicity was listed as "White/Caucasian." Woodson then contacted Stephan and advised her that Jessica was not eligible for transfer.

Someone from the WISD called Brewer and asked her to meet with Stephan and defendant Marlene S. Allen, Community Liaison for the Program, on Monday, August 31, 1998. At that meeting, Brewer was informed that Jessica was not eligible for transfer. The parties dispute the exact reason given; Brewer claims that Allen told her that it was because Jessica was "white," whereas Allen claims that she said it was because Jessica was a "nonminority" pupil. That semantic distinction is of no moment here, however, as it is clear that it was Jessica's race that led defendants to conclude that she was ineligible for transfer.

Notwithstanding defendants' unequivocal statement that Jessica could not be transferred under the Program, on September 8, 1998, the first day of the new school year, plaintiffs took Jessica to Iroquois. School officials met them there and again told plaintiffs that Jessica could not be admitted under the Program. Jessica now attends School 39, as she has in the past.

Plaintiffs commenced this action on September 18, 1998. The complaint asserts six causes of action: (1) breach of contract under New York law; (2) promissory estoppel under New York law; (3) a violation of Jessica's rights under the Equal Protection Clause; (4) a violation of 42 U.S.C. § 2000d, which prohibits race discrimination in federally-funded programs; (5) a violation of N.Y. Ed. L. § 3201, which provides that "[n]o person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin"; and (6) a claim under 42 U.S.C. § 1983. Plaintiffs allege that this episode has caused Jessica emotional distress, that she no longer enjoys going to school, and that her grades have dropped as a result.

## DISCUSSION

### I. Legal Standards on a Motion for a Preliminary Injunction

■ "A party seeking a preliminary injunction must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.'" *N.A.A.C.P., Inc. v. Town of East Haven,* 70 F.3d 219, 223 (2nd Cir.1995) (quoting *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991)). The "'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *East Haven,* 70 F.3d at 223.

■ In some situations, a higher standard applies. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo'—*i.e.,* is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995)).

In the instant case, Jessica is currently attending School Number 39, as she has since first grade. She has never attended Iroquois. Since the relief requested by plaintiffs—an injunction directing defendants to admit Jessica to Iroquois—would alter the status quo, they must meet this higher standard. To meet the "likelihood of success" prong, then, plaintiffs must make a clear or substantial showing of a likelihood of success on the merits.

I also note that no hearing is required in this case. Although a court deciding a motion for a preliminary injunction must conduct a hearing if any essential facts are in dispute, *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989); *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir.1987), no hearing is necessary if the facts are undisputed or if a hearing would not yield additional pertinent information. *United States v. Ianniello*, 824 F.2d 203, 207 (2d Cir.1987); *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 428 F.2d 551, 554–55 (2d Cir. 1970) ("not every application for a preliminary injunction require[s] an evidentiary hearing"). Rather, " 'there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.' " *Consolidated Gold Fields PLC*, 871 F.2d at 256 (citation omitted). In addition, "[w]here a party against whom an injunction is sought is 'demonstrably "content to rest" on affidavits submitted to the court,' no evidentiary hearing is necessary." *Benten v. Kessler*, 799 F.Supp. 281, 283 n. 1 (E.D.N.Y.1992) (quoting *Fengler*, 832 F.2d at 748); *Association of Flight Attendants v. United Airlines*, 797 F.Supp. 1115, 1117 n. 2 (E.D.N.Y.), *rev'd on other grounds*, 976 F.2d 102 (2d Cir.1992).

In the case at bar, neither side has requested a hearing, and the essential facts are not in dispute. In fact, when asked at oral argument on the motion whether a hearing or additional evidence was necessary, counsel for both sides agreed that the material facts were largely undisputed and that the issue before the Court was a legal one. In particular, all the parties agree that Jessica was barred from participating in the Program or transferring to Iroquois because she is white and that only minority students in the City of Rochester can take advantage of the Program. The central issue before me, then, is the purely legal issue of whether defendants' actions violated Jessica's rights, principally as analyzed under the Equal Protection Clause of the Fourteenth Amendment.

## II. Irreparable Harm

The Second Circuit has described irreparable harm as "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction . . . ." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985). Irreparable harm has been defined generally as an "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Additionally, "the harm must be imminent or certain, not merely speculative." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir.1996) (quoting 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948, at 440 (1973)), *cert. denied*, —— U.S. ——, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *accord Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984); *see also Scelsa v. City Univ. of New York*, 806 F.Supp. 1126, 1135 (S.D.N.Y. 1992) ("The law in this Circuit is that a constitutional deprivation constitutes per se irreparable harm"); *Gour v. Morse*, 652 F.Supp. 1166, 1173 (D.Vt.1987) ("Constitutional rights are so basic to our society that their deprivation is almost by definition irreparable"). In addition, "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." *Jolly*, 76 F.3d at 482.

Although there is some authority from other circuits that an alleged constitutional violation does not necessarily give rise to irreparable injury in every case, *see, e.g., Cun-*

*ningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987); *Flower Cab Co. v. Petitte,* 685 F.2d 192, 195 (7th Cir.1982), those cases involved situations in which the actual harm was of an economic nature and could thus be remedied by damages. *See Cunningham,* 808 F.2d at 821 (plaintiff's ultimate injury caused by alleged racial discrimination was that an airport concession was awarded to someone else, and if plaintiff were successful in litigation, court could direct defendant to award concession to plaintiff and could award lost profits and other monetary damages to compensate plaintiff for period of time that he was wrongfully deprived of concession); *Flower Cab,* 685 F.2d at 195 ("The present case involves property rights, specifically taxicab licenses that, being bought and sold continually, have a readily ascertainable market price"); *cf. Jolly,* 76 F.3d at 482 ("the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily"); *see also Milwaukee County Pavers Ass'n v. Fiedler,* 707 F.Supp. 1016, 1032 (W.D.Wis.) ("equal protection rights are 'so fundamental to our society that any violation thereof will cause irreparable harm irrespective of the financial impact'") (quoting *M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D.Tenn.1981)), *modified on other grounds,* 710 F.Supp. 1532 (W.D.Wis.1989). That is not the case here. The injury to Jessica is that she is not being allowed to attend school at Iroquois, which she would have been allowed to do if she were a member of one of the four eligible minority groups. The harm stemming from the alleged violation of her right to equal protection, then, cannot easily be translated into dollars and cents. *See Back v. Carter,* 933 F.Supp. 738, 754 (N.D.Ind., 1996) ("The injury that Back allegedly suffered due to discrimination is an equal protection injury which is very difficult to compensate with legal remedies," and plaintiff therefore did not have an adequate remedy at law). I conclude, therefore, that plaintiffs have sufficiently demonstrated irreparable harm.

## III. Likelihood of Success on the Merits

Whether plaintiffs have shown a clear likelihood that they will succeed on the merits of this case must be determined with reference to the continually expanding body of law addressing under what circumstances, and to what extent, governmental bodies can treat different persons or groups of persons differently from one another on account of their race. In particular, the issue here is whether defendants can legitimately allow only members of certain minority groups to transfer out of RCSD schools as a means of reducing "racial isolation" in the schools.

Classifications based on race have long been suspect and courts must carefully examine and justify them. In fact, the parties here agree that the standard under which this Court must evaluate the constitutional validity of the Program as it has been applied to Jessica is strict scrutiny, which applies to all government classifications based on race. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–95, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Hiller v. County of Suffolk,* 977 F.Supp. 202, 206 (E.D.N.Y.1997). This heightened scrutiny is as it should be since race-based decisions by a governmental entity run counter to the basic principle behind the Equal Protection Clause.

> The central purpose of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (*citing Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). It seeks ultimately to render the issue of race irrelevant in governmental decision making. *See Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) ("a core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination.")

*Hopwood v. State of Texas,* 78 F.3d 932, 939–940 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 135 L.Ed.2d 1094 (1996).

To survive under this heightened standard, the challenged racial classification must both serve a compelling governmental interest, and be narrowly tailored to further

that interest. *Adarand*, 515 U.S. at 227, 115 S.Ct. 2097. In the case at bar, defendants' chief proffered compelling governmental interest is reducing or preventing "racial isolation," which, as stated, is defined by state regulations as occurring whenever "a school or school district enrollment consists of a predominant number or percentage of students of a particular racial/ethnic group." 8 N.Y.C.R.R. § 175.24(a)(2).

Defendants contend that there are several reasons why it is desirable to reduce racial isolation, such as preparing students to function in adult society, in which they will encounter and interact with people from many different backgrounds. Increasing diversity at the elementary-school level, defendants contend, will help make students more tolerant and understanding of others throughout their lives. Defendants also contend that governments have a compelling interest in eliminating *de facto* segregation, although they do not contend that such segregation exists within any of the individual participating school districts. Furthermore, defendants do not deny that, to the extent that the RCSD has a comparatively greater percentage of minority students than the suburban districts, that is simply a result of the fact that the City of Rochester has a higher percentage of minority residents than do its suburbs. Defendants also do not allege that the relative predominance of minorities with the RCSD is a lingering effect of any past discrimination by the RCSD itself. In short, then, while defendants advance a number of reasons why the Program has beneficial effects, ultimately defendants' allegedly compelling interest is in eliminating racial isolation, *i.e.*, to increase racial diversity throughout the participating districts.

In the years since the Supreme Court issued its landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the question of what actions governmental bodies must, may, or may not do in matters involving race has given rise to an extensive body of case law that continues to grow and evolve. Much of that case law has dealt with matters involving schools, from the elementary to the postgraduate level. A review of the cases reveals that this is one of those areas of the law in which it is often far easier to articulate general constitutional principles than to apply those principles to a particular set of facts. That is probably so because by their very nature, racial classifications that treat members of one race differently from those of another lend themselves to opposing characterizations; a benefit that is given to members of one race but not another, no matter how well-intentioned, can almost always be seen as discriminatory with respect to the latter group.

Some of the lack of clarity in this area may also be traced to district and appellate courts' attempts to follow or construe Supreme Court cases, which have left in their wake a legal framework that is in many respects fragmentary and subject to various interpretations. Usually, each Supreme Court decision on these issues contains separate opinions from the participating Justices setting forth different, often conflicting, bases for the judgment of the Court. In fact, judges and courts have not always agreed even as to the continued validity of certain Supreme Court decisions or statements contained within those decisions.

The New York statute that provides funding and the goals of the Program provide our framework for analysis. The New York statute that now provides funding for the Program and the applicable regulations require that the Program be designed to reduce "racial isolation." (Ed. L. § 3602(36)). Therefore, one of the principal stated goals of the Program is to reduce minority isolation.

Although the New York statute speaks in terms of avoiding racial isolation, that is in essence a negatively-phrased expression for attaining the opposite of racial isolation which is racial diversity. In any event, semantics should not obfuscate what is occurring here. The Program seeks to achieve its goal of moving "minority" students from a city district that consists of a high percentage of such students to other, suburban districts, where the percentage of such minority students is not as great. In defendants' view, that effort—to populate suburban schools with more minorities—is so "beneficial" that it warrants precluding and prevent-

ing nonminority students from seeking the same opportunity—to go to a school, free of cost, that the student perceives to be a "better" school. Whether this goal passes constitutional muster under the present state of the law is the issue before the Court.

The case law is not entirely uniform regarding whether a state's interest in promoting racial diversity may ever constitute a compelling interest for purposes of equal-protection analysis. The concept of diversity in general as a compelling interest springs largely from Justice Powell's opinion in *Bakke*. Although concluding that a state medical school's policy of setting aside a certain number of spaces each year for minority applicants was unconstitutional, Justice Powell opined that schools do have a legitimate interest in attaining a diverse student body in order to promote a broad, healthy exchange of ideas and viewpoints. Justice Powell cautioned, however, that "[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.* at 315, 98 S.Ct. 2733. He concluded that a school could properly deem an applicant's race to be a "plus," so long as that applicant were not insulated from comparison with all other applicants, based on each applicant's combined qualifications, which might include their personal talents, leadership qualities, maturity, etc. *Id.* at 317, 98 S.Ct. 2733.

Because of the way that the Justices in *Bakke* were split, however, Justice Powell's opinion, though it announced the *judgment* of the Court, in a number of respects did not represent the views of a majority of the Court. Justice Powell found the admissions policy at issue in that case to be unconstitutional and that the plaintiff was entitled to be admitted, while four other justices preferred not to reach the constitutional issue, concluding that the plaintiff's rights under Title VI had been violated. Four other justices were of the view that the challenged policy was constitutional, but agreed with Justice Powell that the state court whose decision was being reviewed had erred in ruling that the school could never take an applicant's race into account at all.[3] Only Justice Powell, then, expressed the view that the attainment of a diverse student population could be a compelling state interest; no other Justice joined in his opinion on that point. So, Justice Powell's lone opinion in *Bakke* is hardly conclusive authority to justify the Program at issue. Within the past several years, two Federal Circuit Courts of Appeals have rejected programs in schools, not unlike the program at hand, in terms of purpose and effect as a violation of equal protection. Neither court was persuaded that Justice Powell's opinion in *Bakke* required a different result.

The Court of Appeals for the Fifth Circuit in *Hopwood,* 78 F.3d at 944, stated that "Justice Powell's view in *Bakke* is not binding precedent on this issue," and held that "*any* consideration of race or ethnicity ... for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment." *Hopwood* involved a program at the University of Texas Law School that provided substantial racial preferences for minorities in the admissions process. That program set aside certain

---

**3.** Defendants also cite Justice O'Connor's statement in her concurring opinion in *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 286, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), that "although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest.'" The only citation in support of that assertion was Justice Powell's opinion in *Bakke,* however, and thus Justice O'Connor's statement was "purely descriptive and did not purport to express her approval or disapproval of a compelling interest." *Hopwood,* 78 F.3d at 945 n. 27. Moreover, Justice O'Connor said nothing about using race as either a prerequisite for or a bar to participation in a government-administered program, and subsequent statements by her in *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 612, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting), and *Croson,* 488 U.S. at 493, 109 S.Ct. 706 (plurality opinion), cast doubt on whether she believed that diversity could rise to the level of a compelling interest in an educational setting. *Hopwood,* 78 F.3d at 945 n. 27; *United States v. Board of Educ. of the Township of Piscataway,* 832 F.Supp. 836, 848 (D.N.J.1993), aff'd sub. nom. *Taxman v. Board of Educ. of Township of Piscataway,* 91 F.3d 1547 (3d Cir. 1996), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997).

spots in the entering law school class with lower standards for admission for minority applicants. The court held that any consideration of race or ethnicity by the law school for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment and fails to meet the steep standard of strict scrutiny. *Id.* at 944, 948. Indeed, the court noted that "no case since *Bakke* has accepted diversity as a compelling state interest under a strict scrutiny analysis." *Id.* at 944.

The Fifth Circuit, in *Hopwood*, has thus rejected the concept of "diversity" in the schools as a compelling interest justifying race-based action. Other courts have found a constitutional violation, not because diversity may not be considered but because the race-based activity was not narrowly tailored.

For example, in *Hopwood*, Judge Wiener of the Fifth Circuit, in a concurring opinion, stated that he did not believe that Supreme Court authority on the subject was clear enough to conclude that diversity could never be a compelling interest, but that, assuming, without deciding, that diversity is a compelling interest, the school's admissions process in *Hopwood* was not narrowly tailored to achieve diversity. Judge Wiener did not state whether he believed that race could be taken into account as a possible "plus," but he did state that "facial diversity," *i.e.*, diversity of skin color, "is not true diversity, and a system thus conceived and implemented simply is not narrowly tailored to achieve diversity." *Id.* at 966. Judge Wiener concluded by referring to Justice Powell's opinion in *Bakke* that true diversity "encompasses a far broader array of qualifications in characteristics of which racial or ethnic origin is but a single though important element." *Bakke*, 438 U.S. at 316, 98 S.Ct. 2733. But, Judge Wiener concluded that the program adopted by the University of Texas was really a set aside or quota system and was not narrowly tailored to achieve true diversity. *Hopwood*, 78 F.3d at 966.

Most recently, the First Circuit struck down a similar admissions policy in the Boston, Massachusetts school system. On November 19, 1998, the First Circuit struck down an admissions policy at a school that gave preferential consideration to minorities at the expense of whites. In *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir.), the First Circuit reversed a district court's judgment in favor of the Boston School Committee, which had adopted a two-track admissions policy for three "examination schools" in Boston, Massachusetts. Defendants in the case before me had relied heavily on the district court opinion in *Wessman* which had upheld the challenged admissions policy.

Under the policy, half of the available seats at each school were awarded solely on the basis of students' composite scores, which were based on the students' grade point averages and entrance examination scores. The other half were also awarded according to composite score rankings, but with the addition of "flexible racial/ethnic guidelines," which required that the remaining seats be allocated, according to composite score rank, in proportion to the racial and ethnic composition of each school's remaining qualified applicant pool. The application of these guidelines for the 1997–98 academic year resulted in the rejection for one particular school of eleven white students, including the plaintiff, all of whom had higher composite scores than eleven minority students who were admitted to that school.

As part of the basis for its ruling, the district court stated that "[t]he Boston School Committee has a compelling governmental interest in adopting a policy that seeks to attain the educational benefits of diversity for its students." *Wessmann v. Boston Sch. Comm.*, 996 F.Supp. 120, 128 (D.Mass.1998). On appeal, the First Circuit stated that in the absence of a clear signal from the Supreme Court that Justice Powell's discussion of diversity as a compelling interest in *Bakke* is not good law, the court was not prepared to reach that conclusion itself. However, the court said, assuming *arguendo* that diversity might, in some circumstances, be sufficiently compelling to justify race-conscious actions, "the School Committee's flexible racial/ethnic guidelines appear to be less a means of attaining diversity in any constitutionally relevant sense and more a means of racial balancing," which is neither "a legitimate [n]or neces-

sary means of advancing the lofty principles recited in the Policy." *Wessmann*, 160 F.3d at 799.

Another Circuit Court, the District of Columbia Court of Appeals, has recently rejected the concept of "diversity" as a compelling governmental interest, albeit in an employment context. In *Lutheran Church–Missouri Synod v. F.C.C.*, 141 F.3d 344 (1998), the court struck down certain F.C.C. regulations that granted preferences to minorities in connection with hiring practices at radio stations seeking to renew their licenses. The regulations rested on the agency's desire to foster "diverse" programs appealing to minorities. The court, however, rejected the notion that the agency's interest in diverse programming, purportedly affecting minorities, was of a sufficiently compelling interest to warrant the racial quotas at issue. Furthermore, even if the agency's interest were compelling, the court determined that the regulations were not narrowly tailored. *Id.* at 355–56.

The attainment of diversity in the elementary-school context has also been the subject of litigation in the United States District Court for the Eastern District of Virginia. There, the Arlington County School Board used an admissions policy for its three "alternative schools," including the Arlington Traditional School ("ATS") (an elementary school with an emphasis on a "traditional" method of education), that was designed to attain an ethnic distribution of students which approximated that of the general school population. To that end, applicants to ATS were randomly assigned numbers, with the lowest numbers granted admission first. Instead of accepting applicants on a strict lottery basis, however, white applicants were passed over in favor of minority students with higher numbers if necessary to reach the sought-after racial composition. In the lottery for the 1997–98 class, forty-one white applicants (out of a pool of 145 applications) were passed over to "get to" the last-ranked student accepted to ATS. After some applicants declined invitations for admission, additional invitations were extended, with the result that an additional fourteen whites were passed over.

The parents of some of the passed-over white applicants sued the school board, alleging a violation of their children's right to equal protection. The district court granted the plaintiffs' motion for a preliminary injunction that, among other things, ordered the board to cease using race as a factor in offering invitations for admission to the alternative schools, and to issue invitations to all students who would have been admitted to the alternative schools for the 1997–98 school year but for the racial preferences.

Rejecting the school board's contention that its admissions program was justified by the board's legitimate power to take steps to create a diverse student enrollment, the court stated that although there is dicta in some cases to that effect, the premise supporting that notion "is that there is present in the challenged-school system racial discrimination or the present effects of past discriminatory practices." *Tito v. Arlington County Sch. Bd.*, No. 97–540–A, slip. op. at 7 (E.D.Va. May 13, 1998). There was no allegation in *Tito* of such discrimination, the court stated, and the court found "no compelling state interest served by the defendant's admissions policy." *Id.* at 9. Noting that "[r]ace is the sole decisive factor ATS considers in accepting students once the white 'cap' is met through random selection," the court stated that "more is needed than the facile talisman of 'diversity' to justify infringing the constitutional right not to be discriminated against on the basis of race." *Id.* at 10, 11.

The court in *Tito* also held that even if the school board could establish a compelling state interest furthered by the admissions program, the program was not narrowly tailored to achieve the desired goal. The program, the court said, "creates a rigid dichotomy between white and non-white students, treating the former as one group and the latter as another preferred group." *Id.* at 12.

In what is perhaps the most factually similar case to the case at bar, the court in *Equal Enrollment Ass'n v. Board of Educ. of the Akron City Sch. Dist.*, 937 F.Supp. 700 (N.D.Ohio 1996), enjoined a school district from enforcing a race-based student transfer program. In *Equal Enrollment*, an Ohio

open-enrollment statute permitted students native to public school districts to transfer to adjacent districts if the adjacent districts permitted such transfers. The statute, however, permitted the native school district to object to a transfer "in order to maintain an appropriate racial balance." *Id.* at 702 (quoting O.R.C. § 3313.98(F)(1)(a)). Concerned that the open-enrollment statute might create racial disparities within the Akron City School District, the Akron Board of Education adopted a policy expressly providing that except in limited circumstances, "no white student shall be permitted to enroll in an adjacent district . . . ." *Id.* Later, the Akron Schools ordered that no non-white student would be accepted into the Akron schools from an adjacent district.

An association of parents of white students who wished to transfer out of the Akron district sued, alleging a violation of their children's rights under the Equal Protection Clause. Observing that the board's policy was purely "a preventative measure directed to an anticipated problem, rather than . . . a remedial measure to right an already recognized discriminatory practice or condition," the court said that the board itself conceded that "absent a finding of past discrimination, no race-based regulation has been upheld." *Id.* at 706. The court also found little basis in the evidence to support the board's fear that the open-enrollment program "would cause massive 'white flight' which would forever affect the racial makeup of the Akron Public Schools." *Id.* at 707. For one thing, the court said, the neighboring school districts' relatively small excess capacity would limit the number of students who could transfer out of Akron. *Id.*

As in *Tito,* the court in *Equal Open Enrollment* also found that even if the Board could show that a compelling state interest existed, the policy at issue was not narrowly tailored. On the contrary, the court said, "the method chosen . . . was the most drastic available," since it simply barred white students from transferring out of Akron or non-whites from transferring in. *Id.* at 708.

An additional problem, the court stated, was the vagueness of the term "appropriate racial balance." Although acknowledging

that the term had been foisted upon the school district by a state statute, the court asked rhetorically how "the court or anyone else [was] to know how such an 'appropriate racial balance' was determined or whether it has been achieved[.]" The court concluded that, "[w]ritten as it is, the policy is irretrievably overbroad." *Id.*

█ What emerges from the case law, especially the more recent case law, is the principle that classifications based SOLELY on race, in the absence of past identifiable governmental discrimination, are almost—if not absolutely—never permissible. *See Hopwood,* 78 F.3d at 944 (Supreme Court "appears to have decided that there is only one compelling state interest to justify racial classifications: remedying past wrongs") (citing *J.A Croson,* 488 U.S. at 496, 109 S.Ct. 706 (plurality opinion)); *see also Taxman v. Board of Educ. of Township of Piscataway,* 91 F.3d 1547, 1563 (3d Cir.1996) (non-remedial affirmative action plan is never permissible under Title VII), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997). Absent findings of actual discrimination, "there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *J.A. Croson,* 488 U.S. at 511, 109 S.Ct. 706 (plurality opinion). Therefore, I must conclude that, for the same reasons expressed in the cases discussed above, the Program, as applied to Jessica, violates her constitutional right to equal protection insofar as her race was determined to be a complete bar to participation in the Program. Whether defendants can demonstrate the existence of a compelling state interest in fostering racial diversity or avoiding racial isolation is doubtful, but even assuming that they can, the Program as applied is anything but narrowly tailored. Plaintiffs are therefore entitled to injunctive relief.

As a review of the case law demonstrates, the result that I have reached here is entirely consistent with the majority of post-*Bakke* cases in this area. Almost without exception, courts that have addressed the issue of racial classifications in an academic setting have struck down programs employing such classifications unless they were narrowly tailored

to remediate existing segregation or discrimination, or the lingering effects of past segregation or discrimination.

Diversity, in a broad, general sense, may certainly be "a constitutionally *permissible* goal" for schools to seek to attain. *Bakke,* 438 U.S. at 311, 98 S.Ct. 2733 (Powell, J.) (emphasis added). The standard of strict scrutiny, however, demands more than a permissible goal; it requires that the state have a compelling interest in achieving that goal. Moreover, "[t]o justify something so antithetical to our constitutional jurisprudence [as racial balancing], a particularly strong showing of necessity would be required." *Wessmann,* 160 F.3d at 799. No such showing has been made here. "Attractive labeling cannot alter the fact that any program which induces schools to grant preferences based on race and ethnicity is constitutionally suspect." *Id.* at 794.

This is not to say that some of the goals of the Program are not laudable. Exposing students to persons their age from different backgrounds, different perspectives and the like may well prepare them to be responsible, productive adult citizens in a pluralistic society. One of the major problems with the Program, however, is that it treats students not as individuals, but as groups. The Program implicitly assumes that all members of a given race or ethnic group share certain characteristics, apart from their race or ethnicity itself, that differentiate them from members of other races or ethnic groups. *See Wessmann,* 160 F.3d at 799 ("if justified in terms of group identity, the Policy suggests that race or ethnic background determines how individuals think . . ."); *Hopwood,* 78 F.3d at 946 ("[t]he assumption . . . that a certain individual possesses characteristics by virtue of being a member of a certain racial group . . . does not withstand scrutiny").

The Program, then, at least as it has been applied here, does not appear designed to promote genuine diversity in the sense of bringing together students from diverse backgrounds or with diverse ideas and viewpoints; its sole purpose is to change the ratio of white students to students within the specified minority groups. But, as other courts have noted: "But facial diversity is not true diversity, and a system thus conceived and implemented simply is not narrowly tailored to achieve diversity." *Hopwood,* 78 F.3d at 966 (Wiener, J, concurring). Absent some remedial purpose engendered by past or present segregation, such "racial balancing" is unconstitutional. *See Bakke,* 438 U.S. at 307, 98 S.Ct. 2733 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids") (Powell, J.); *Taxman v. Board of Educ. of Township of Piscataway,* 91 F.3d 1547, 1561 (3d Cir.1996) ("While we wholeheartedly endorse any statements in [desegregation] cases extolling the educational value of exposing students to persons of diverse races and backgrounds, . . . we cannot accept them as authority for the conclusion that the Board's non-remedial racial diversity goal is a permissible basis for affirmative action under Title VII"), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997); *Hopwood,* 78 F.3d at 944 (remedying past wrongs is the only compelling state interest to justify racial classifications).[4]

The Program does little to achieve anything other than seek some type of facial diversity. It does not foster true diversity, however, since certain races are given preferences in the Program while others are barred completely. But, providing important benefits to one racial group while barring other groups tends to promote racial stereotypes rather than to eliminate them. "The use of race, in and of itself, to choose students simply achieves a student body that *looks* different. Such a criterion is no more rational on its own terms than would be

**4.** Although *Hopwood* and some other cases have stated that no case since *Bakke* has accepted diversity as a compelling governmental interest under a strict scrutiny analysis, the Court has found two more recent district court cases that have done so. One, *Wessmann,* 996 F.Supp. 120, was, as already stated, reversed by the First Circuit. The other, *Eisenberg v. Montgomery County Pub. Schools,* 19 F.Supp.2d 449 (D.Md. 1998), relied in part on the district court decision in *Wessmann,* and is now itself on appeal to the Fourth Circuit. I am not persuaded by the reasoning of *Eisenberg,* and decline to follow it here.

choices based upon the physical size or blood-type of applicants." *Hopwood*, 78 F.3d at 945 (emphasis added). Furthermore, because so few students are accepted into this Program even this flawed goal is suspect. The introduction of a handful of minority students into a suburban school that is substantially white does little to reduce so-called racial isolation.

Perhaps the most constitutionally infirm aspect of the Program, however, is that it is not narrowly tailored to further the alleged interests at stake. Indeed, as in *Equal Open Enrollment*, 937 F.Supp. at 708, the means chosen here are "the most drastic available" in the sense that the Program completely bars any white RCSD student from even being considered for transfer. *See Wessmann*, 160 F.3d at 800 ("The Policy does precisely what Justice Powell deemed anathematic [in *Bakke*]: at a certain point, it effectively forecloses some candidates from all consideration ... simply because of the racial or ethnic category in which they fall"); *Hopwood*, 78 F.3d at 966 (admissions process that is designed only to increase the percentages of students in certain minority groups in a school's entering class "is not narrowly tailored to achieve diversity") (Wiener, J., concurring).

In that regard, it should also be noted that the Program does not discriminate only against whites. Minority students who live in one of the participating suburban districts are not allowed to transfer to a school within the RCSD. For purposes of equal protection analysis, then, this case is no different than if a black student from a suburban district had been barred from transferring to a Rochester school solely because the student was not white. Depending on the student's place of residence, then, a member of *any* racial or ethnic group, minority or otherwise, could be barred from participating in the Program, for no reason other than the color of the student's skin. As the previously cited cases make clear, that is clearly unconstitutional.

Nor does the "voluntary" nature of the Program save it. The mere fact that all the participating students chose to apply is irrelevant when the case involves not a burden that is being forced upon unwilling individuals, but a benefit that is made available only to members of selected racial groups. Students of the "wrong" skin color are not *allowed* to volunteer to participate, which is precisely the problem.

Also troubling are the amorphous goals of the Program, and the arbitrary classifications that have been created to achieve those goals. For example, it is not clear at what point a racial or ethnic group becomes, or ceases to be, "predominant" within a given school or school district. In addition, it is not apparent on what basis the RCSD determined that only students of Asian or American Indian origin should be included as "minority pupils" under the regulatory definition, *i.e.* members of a "racial minority group that historically has been the subject of discrimination." A number of other minority groups that could claim to fit within that definition easily spring to mind.

The arbitrariness of the Program—as well as an example of the insidiousness of the racial stereotyping that can inject itself into such programs—can also be found in defendant Woodson's affidavit describing the application process. She states that sometimes

a question may be raised in our minds as to whether a particular student does meet the minority pupil criterion. This question may be raised in a variety of ways, none of which are perfect or fully reliable ways of determining ethnicity; name, manner of speech and phrasing, and personal appearance of the child as observed during an interview or orientation meeting may give visual or verbal clues (albeit not definitive) concerning a particular child's identity.

Woodson Aff. ¶ 22. If such a question is raised, she states, the child's RCSD file is checked for the student's "declared ethnicity," with one of five numerals used to designate that ethnicity (*e.g.*, "5" stands for "White/Caucasian"). *Id.* ¶ 23.

As Woodson admits, attributes such as one's name, manner of speech and personal appearance are far from definitive indicators of one's race, and may often reflect the observer's own stereotyped expectations more than any objective truth. Moreover, it is not apparent how a Program administrator

would ever arrive at a "definitive" conclusion in this regard. For example, if Jessica's RCSD file had shown that she had declared her ethnicity as "4—Hispanic," would defendants have accepted that, or would they have insisted that she must be white? If they did insist that she was white, on what basis other than the above-mentioned non-definitive "clues" could they rely?

In short, then, the Program seeks to attain a vaguely-defined goal—"avoiding racial isolation"—whose status as a compelling governmental interest is highly suspect, then applies an ironclad, across-the-board means of achieving it by barring all white city students from participating, while at the same time classifying students' race or ethnicity according to imprecise categories and subjective impressions. The result here—the exclusion of Jessica solely because she is listed as "White/Caucasian" in her school records—is a denial of her right to equal protection.

Facial diversity is not true diversity and is not a proper goal. Such a program is simply racial balancing and seems to foster the mentality that it seeks to eliminate, that individuals are "different" because their skin color happens to be different. In fact, persons having the same facial color have very different and distinct backgrounds, skills, prejudices and goals, and simply moving students around on account of their skin color seems to accomplish little. But, whether something is accomplished, the crux of an equal protection analysis is that such action cannot be done at the expense of others who lack that particular skin characteristic.

It should be pointed out, however, that the constitutional infirmity here lies in the Program as it has been *applied* to Jessica and any other student who may have been barred from participating on account of the student's race. This Decision and Order does not

strike down the Program as a whole, or the statutes and regulations pursuant to which it is administered.[5] Nothing in those statutes and regulations appears to *require* that white students be absolutely barred from transferring out of an urban school district into a suburban one, nor is membership in a particular race or ethnic group ever expressly made a prerequisite to participation in the Program. It is true that Ed. L. § 3602(36) provides for funding only if an approved program is "designed to reduce racial isolation ...." It is not clear, however, that defendants could not devise a program that might result in reducing racial isolation without making one's race a conclusive criterion for participation. For example, students might be chosen based on certain non-racial criteria (such as socioeconomic background, family constellation, educational pedigree [or lack thereof] of the parents) that might have some correlation with race or ethnicity, thus resulting in the reduction of racial isolation without actually taking into account the students' race *per se*. See *Hopwood*, 78 F.3d at 946 ("While the use of race *per se* is proscribed, state-supported schools may reasonably consider a host of factors—some of which may have some correlation with race— in making admissions decisions").

Of course, if true diversity is the goal, many other factors could be utilized in evaluating students as individuals rather than as members of a group. In *Hopwood*, that court noted the very unique background of the rejected white applicant (thirty-two year old wife of a member of the armed forces, raising a severely handicapped child). *Id.* at 946. Such a candidate would bring a special perspective to the school if true diversity were the goal.

At any rate, those broader issues are not presently before me. These are properly left

5. Although invited to do so, the New York Attorney General declined to participate in this litigation or defend the constitutionality of the statute in question or the implementation of the Program. On September 24, 1998, the Court sent a letter to the Attorney General, advising him pursuant to 28 U.S.C. § 2403(b) that plaintiffs' claims in this action had drawn into question the constitutionality of Ed. L. § 3602 and 8 N.Y.C.R.R. § 175.24, and requesting him to advise the Court in writing if the Attorney General's

Office sought to participate in the action. In a letter dated October 8, 1998, Assistant Attorney General Denise A. Hartman stated that time constraints "do not permit us to provide you with a comprehensive and meaningful response at this time," and that "[w]e will be in communication with the Court and the parties in the near future." The Court has received no further communications from the Attorney General nor any indication that he does wish to participate in this action.

to those administrators or legislators who may seek to remedy the existing Plan to comport with the requirements of the Constitution. The only issue presented by the facts here is whether one particular child's right to equal protection has been violated, and I find that it has.

Since Jessica was actually accepted for transfer to Iroquois, and since defendants admit that the only reason her transfer was later denied was because of her race, the remedy here is clear. In other cases, *e.g.*, *Hopwood*, the remedy for impermissible race-based systems was not always clear. In some cases, it may be difficult to determine whether the rejected applicant would have encountered the same fate even if the race-based standard had not been applied. No such issue exists here, however. The uncontested facts show that Jessica Haak had been accepted for transfer. Whatever criteria were used by West Irondequoit officials to evaluate students, Jessica met them. She was accepted into the Program and invited for orientation. There is no basis here for the defendants to engage in any *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) type analysis to argue that Jessica would (or could) have been rejected anyway. This record permits no such analysis.

## CONCLUSION

Plaintiff's motion for a preliminary injunction is granted.[6]

Defendants are directed to allow Jessica L. Haak to transfer from the Rochester City School District to the Iroquois Elementary School in the West Irondequoit School District, pursuant to the Urban–Suburban Interdistrict Transfer Program, as soon as practicable, but no later than the start of the second semester or February 1, 1999, whichever is earlier.

Jessica shall continue to be enrolled as a student at Iroquois Elementary School pend-

ing the final resolution of this action, or further order of the Court.

The parties are further directed to submit to the Court a plan, in writing, as to how the parties wish to proceed concerning discovery, trial or other proceeding concerning other issues in the case, within thirty (30) days of entry of this decision.

IT IS SO ORDERED.

---

**6.** As should be evident from the above discussion, the preliminary injunction is based on plaintiffs' claim that the Program as implemented violated the Equal Protection Clause of the Fourteenth Amendment, not on the state-law causes of action. None of those theories appear to support issuance of a preliminary injunction because they do not meet the likelihood-of-success-on-the-merits requirement for granting injunctive relief.